IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Cynthia Lynn Byars, | ) | C/A No.: 1:14-3694-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

        On January 25, 2011, Plaintiff filed an application for DIB in which she alleged her disability began on March 22, 2007. Tr. at 105, 137–38. Her application was denied initially and upon reconsideration. Tr. at 110–13, 118–19. On January 2, 2013, Plaintiff

had a hearing before Administrative Law Judge ("ALJ") John S. Lamb. Tr. at 72–104 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 1, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 22–39. Subsequently, the Appeals Council granted Plaintiff's request for review, but issued an unfavorable decision adopting the majority of the ALJ's findings and conclusions. Tr. at 1–8. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 18, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 52 years old at the time of the hearing. Tr. at 77. She obtained a high school diploma and completed one year of college. *Id.* Her past relevant work ("PRW") was as a child daycare worker and a preschool director. Tr. at 95–96. She alleges she has been unable to work since March 22, 2007. Tr. at 137.

2.    Medical History

a.    Evidence Before ALJ

On December 17, 2001, Plaintiff injured her back while lifting a child in her job as a daycare worker. Tr. at 231. She was initially diagnosed with a lumbar muscle strain and sciatica, prescribed medication, and instructed to avoid heavy lifting. *Id.* Physical therapy failed to relieve the pain in her back and right leg. Tr. at 237. An MRI on February 5, 2002, showed a posterior right paracentral disc herniation at L5-S1, causing displacement and compression of the right S1 nerve root. Tr. at 233. Plaintiff subsequently received

epidural steroid injections, but conservative treatment was ultimately ineffective. Tr. at 234–36.

On April 12, 2002, Gerald L. Rollins, M.D., indicated Plaintiff would likely benefit from surgery. *Id.* John Klekamp, M.D. ("Dr. Klekamp") attempted L5-S1 microendoscopic discectomy ("MED"), but was unable to complete it because of Plaintiff's obesity. Tr. at 238–39. He performed right-sided L5-S1 hemilaminotomy discectomy. Tr. at 238.

An MRI of Plaintiff's lumbar spine on July 17, 2002, showed no evidence of recurrent disc herniation, but indicated extensive postoperative scar tissue in the neural foramina, epidural space, laminotomy site, and posterior paraspinal muscles on the right and postoperative fluid collection in the posterior subcutaneous soft tissues. Tr. at 247. A suspicious area was also noted behind the right L5-S1 facet joint, but Dr. Klekamp interpreted it to be postoperative fluid. Tr. at 248, 279. On July 19, Plaintiff complained to Dr. Klekamp of pain, a burning sensation, swelling, and mild erythema and warmth around the distal aspect of her right foot. Tr. at 281. Dr. Klekamp indicated he believed Plaintiff had possibly developed reflex sympathetic dystrophy ("RSD"). Tr. at 281. Plaintiff subsequently engaged in physical and aquatic therapy at Healthsouth from June 20–26, 2002, and from August 30–October 31, 2002. Tr. at 249–74.

Plaintiff visited Philip LaTourette, M.D. ("Dr. LaTourette"), for an initial pain management assessment on August 2, 2002. Tr. at 578. Dr. LaTourette observed decreased range of motion ("ROM") in Plaintiff's back and significant tenderness over her right sciatic notch. Tr. at 579. Plaintiff's right foot temperature was increased and she

had sensitivity to light touch over its dorsum and plantar aspect. *Id.* Dr. LaTourette described the skin on Plaintiff's left foot as "somewhat erythematous." *Id.* Plaintiff had normal strength in her lower extremities, but decreased sensation to light touch above her right ankle and thigh. *Id.* Dr. LaTourette assessed post-laminectomy pain syndrome. *Id.* He increased Plaintiff's dosages of Tylox and Neurontin and instructed her to follow up in one week. *Id.* Plaintiff treated with Dr. LaTourette on August 13, September 13, October 9, and November 15. Tr. at 573–77.

On November 22, 2002, Dr. Klekamp indicated Plaintiff had increased strength and less pain in her right lower extremity and had returned to two jobs. Tr. at 277. He set forth the following restrictions: "no bending, stooping or lifting greater than 20 lbs. permanent." Tr. at 278. He stated Plaintiff could take a CPR certification on a tabletop, but should not be required to do any stooping or bending. *Id.* He placed her at maximum medical improvement and assessed a 14 percent permanent impairment rating. Tr. at 277.

Plaintiff followed up with Dr. LaTourette on January 7, 2003. Tr. at 571. Dr. LaTourette explained Plaintiff's pain was likely secondary to post-laminectomy syndrome at L5 causing a lumbar radiculopathy and pain down her leg and foot. Tr. at 571. He recommended selective nerve root injections at L4-5 and L3-4. *Id.*

Plaintiff was evaluated by Glenn L. Scott, M.D. ("Dr. Scott"), on February 4, 2003. Tr. at 289–91. Dr. Scott indicated nerve root scarring and secondary pain were more likely than RSD, but he could not rule out RSD. Tr. at 290. He stated he did not believe Plaintiff was at maximum medical improvement and recommended a new MRI using Gadolinium enhancement and a serum uric acid study. *Id.*

4

Plaintiff participated in a functional capacity evaluation on May 8, 2003. Tr. at 569. The results of the evaluation indicated she was capable of performing work at the light exertional level over the course of an eight-hour workday. *Id.*

On May 19, 2003, Plaintiff complained to Dr. LaTourette of back, leg, and foot pain, but she indicated her activities had increased and that she continued to work part-time at the Baptist church. Tr. at 570. Dr. LaTourette noted that Plaintiff had not undergone spinal injections or spinal cord stimulation trial. *Id.* He found Plaintiff to be at maximum medical improvement and supported the restrictions and impairment rating assessed by Dr. Klekamp the previous November. *Id.* Plaintiff regularly followed up with Dr. LaTourette and with Kacie Tartaro, FNP ("Ms. Tartaro"), in his office between 2003 and 2007. Tr. at 523–68.

On February 21, 2007, Plaintiff reported to Dr. LaTourette that she continued to work full-time and that her pain was more severe at the end of the day. Tr. at 520. She indicated she was reluctant to take medication while working because of its mild sedative effect. *Id.* She stated she was doing well overall, but complained of significant pain in her right foot, back, and legs. *Id.* She assessed her pain as a seven of 10. *Id.* Dr. LaTourette observed Plaintiff's thoracolumbar ROM to be decreased in all directions. Tr. at 521. Plaintiff was tender to palpation in her midline and facets, but had normal strength in her bilateral upper and lower extremities. Tr. at 521–22.

On April 19, 2007, Plaintiff assessed her pain as a two to five of ten, but complained of bowel and bladder urgency. Tr. at 366. She reported she was recently released from her job. *Id.* Ms. Tartaro observed tenderness in Plaintiff's midline,

sacroiliac joint, and gluteals. Tr. at 367. Plaintiff gait and strength were normal, but she had decreased sensation to light touch in her right lower extremity. *Id.* Ms. Tartaro instructed Plaintiff to consult her primary care physician for incontinence. Tr. at 368.

On August 15, 2007, Plaintiff reported recent left lower extremity numbness. Tr. at 363. She assessed her pain as a three to seven of 10 with medication. *Id.* Ms. Tartaro observed tenderness in Plaintiff's midline, facets, and sacroiliac joint. Tr. at 364. Plaintiff had normal muscle strength, but decreased sensation to light touch in her right lower extremity. *Id.* Ms. Tartaro recommended Plaintiff increase her Neurontin dosage back to three times daily to decrease left lower extremity numbness. *Id.*

On November 19, 2007, Plaintiff reported bowel and bladder incontinence and shooting pain in her left back and hip over the prior two-month period. Tr. at 360. She assessed her pain as a three of 10. *Id.* Plaintiff reported she was enjoying staying at home, was cooking more often, and was spending more time with her child. *Id.* Ms. Tartaro observed Plaintiff to have decreased cervical ROM with side bending to the right and to be tender to palpation in her midline, facets, and sacroiliac joint, more so on the right than on the left. Tr. at 361. Plaintiff had normal strength, but decreased sensation to light touch in her right lower extremity. *Id.*

An MRI on November 29, 2007, revealed moderate disc bulges at L4-5 and L5-S1, a developmentally-small spinal canal secondary to short pedicle syndrome, and central canal stenosis due to posterior facet and ligamentous disease at L3-4 and L4-5. Tr. at 370–71. Plaintiff had a probable postoperative seroma or hematoma posterior to L5-S1 and a large cystic mass in her right pelvis. Tr. at 371.

On December 3, 2007, Plaintiff recounted to Ms. Tartaro an incident in which she fell at work in January or February. Tr. at 356. She indicated her back pain worsened for two days, but improved. *Id.* She stated her left knee was sprained, but improved after two months. *Id.* Plaintiff indicated she had bowel incontinence on three to four occasions and urinary incontinence on four occasions since the fall. *Id.* She assessed her pain as a two to three with medication. *Id.* Ms. Tartaro observed tenderness in Plaintiff's midline and facets. Tr. at 357. Plaintiff had normal strength in her bilateral lower extremities, but decreased sensation to light touch in her right lower extremity. Tr. at 357–58. Ms. Tartaro instructed Plaintiff to follow up with her gynecologist regarding incontinence. Tr. at 358.

On January 14, 2008, Plaintiff reported her pain to be a three to five of 10. Tr. at 354. She stated her leg pain was relieved by Neurontin. *Id.* On April 7, 2008, Plaintiff reported her pain was generally controlled with medications, but was exacerbated when it rained. Tr. at 350. Plaintiff stated she was walking and performing minimal housework. *Id.* Ms. Tartaro observed tenderness in Plaintiff's midline and facets and decreased sensation to light touch in her right lower extremity. Tr. at 351–52.

On July 7, 2008, Plaintiff reported to Ms. Tartaro that she felt more achy after discontinuing use of Celebrex, but. indicated she could deal with her pain with Percocet. Tr. at 346. Ms. Tartaro discussed water therapy, but Plaintiff indicated she would instead walk for 20 to 30 minutes per day. *Id.* Plaintiff stated she was "aggravated" because pain limited her activity. *Id.* Ms. Tartaro encouraged her to consider psychiatric treatment, but Plaintiff refused. *Id.* Plaintiff's gait was antalgic and she was tender in the midline, facets,

and paravertebrals. Tr. at 347. She had normal strength, but decreased sensation to light touch in her right lower extremity. Tr. at 348.

On October 8, 2008, Plaintiff reported incontinence, but stated her medications were controlling her pain. Tr. at 342. Ms. Tartaro observed Plaintiff to have antalgic gait, normal lower extremity strength, and decreased sensation to light touch in her right lower extremity. Tr. at 343–44.

On January 14, 2009, Plaintiff reported urinary incontinence and left lower extremity weakness, but denied new incidents of bowel incontinence. Tr. at 339. She assessed her pain as an eight of 10. *Id.* Ms. Tartaro described Plaintiff's gait as antalgic and noted tenderness in her midline and paravertebral areas, normal lower extremity strength, and decreased sensation to light touch in the right lower extremity. Tr. at 340.

Plaintiff reported on March 11, 2009, that her pain depended on her activity and would flare up for several days at a time. Tr. at 336. She described her pain as tolerable at five to six of 10 with medication. *Id.* She reported three to four episodes in which her legs gave way since her last visit. *Id.* However, she noted she had started walking more often. *Id.* Ms. Tartaro noted tenderness in Plaintiff's midline, facets, sacroiliac joints, paravertebral spine, and gluteals. Tr. at 337. Plaintiff had normal strength in her lower extremities, but decreased sensation to light touch in her right lower extremity. *Id.*

On May 13, 2009, Plaintiff reported to Ms. Tartaro that she was walking for 20 minutes on four days per week. Tr. at 332. She indicated her pain was tolerable with medication and assessed it as a three of 10 on good days. *Id.* She reported recent episodes of left back pain and bowel urgency. *Id.* Plaintiff was tender in the midline, facets, and

paravertebral spine. Tr. at 333. She had normal strength in her bilateral extremities, but decreased sensation to light touch in her right lower extremity. *Id.*

Plaintiff complained to Ms. Tartaro of headaches and pain in her left foot on July 13, 2009. Tr. at 328. Ms. Tartaro observed Plaintiff to have antalgic gait; tenderness to palpation in her midline, facets, sacroiliac joints, paravertebrals, and gluteals; normal strength in her bilateral lower extremities; decreased sensation to light touch in her left lower extremity; and +1 bilateral lower extremity edema. Tr. at 329–30. She noted Plaintiff's left foot was tender along the lateral heel and ankle area. Tr. at 330.

On September 10, 2009, Plaintiff reviewed her blood sugar log with Susan Finch, M.D. ("Dr. Finch"), and Dr. Finch adjusted Plaintiff's diabetes medications. Tr. at 400–01. Plaintiff followed up with Dr. Finch on September 25, 2009, for uncontrolled diabetes, and Dr. Finch again adjusted the insulin dosage. Tr. at 398.

On October 14, 2009, Plaintiff reported to Ms. Tartaro that her left foot pain and urinary problems had improved. Tr. at 324. She indicated she experienced pain in her back, leg, and right foot and assessed it as an eight of 10. *Id.* Ms. Tartaro observed Plaintiff to have antalgic gait; tenderness to palpation in her midline, facets, sacroiliac joint, paravertebrals, and gluteals; normal strength in her bilateral lower extremities; and decreased sensation to light touch in her right lower extremity. Tr. at 325. She refilled Percocet, Neurontin, and Prozac. Tr. at 326.

On October 16, 2009, Dr. Finch prescribed Lisinopril for hypertension and increased Plaintiff's nighttime dosage of insulin. Tr. at 396.

Plaintiff followed up with Dr. Finch for diabetes management on November 16, 2009. Tr. at 394. She reported better control of her blood sugars. *Id.* Dr. Finch observed no abnormalities on examination, refilled Plaintiff's medications, and instructed her to follow up in two to three months. Tr. at 394–95.

On December 14, 2009, Plaintiff reported to Ms. Tartaro that her pain had increased due to the colder weather and that she was generally taking two Percocet per day. Tr. at 321. She complained of pain in her back, legs, and right foot that she classified as an eight of 10. *Id.* Ms. Tartaro observed Plaintiff to have normal gait; tenderness to palpation in her midline, facets, sacroiliac joints, paravertebrals, and gluteals; normal strength in her bilateral lower extremities; and decreased sensation to light touch in her right lower extremity. Tr. at 322. She prescribed a greater quantity of Percocet to accommodate Plaintiff's increased pain. Tr. at 323.

On December 17, 2009, Plaintiff reported to Dr. Finch that she felt better. Tr. at 392. She indicated she was upset by recent weight gain, but Dr. Finch indicated the weight gain was a sign that Plaintiff's blood sugar was better controlled. *Id.* Dr. Finch refilled Plaintiff's medications and encouraged her to resume use of Trilipix, which Plaintiff had stopped because of muscle aches and pains. Tr. at 393.

Plaintiff followed up with Ms. Tartaro on January 27, 2010, and reported that she had good and bad days, but that weather changes made her pain worse. Tr. at 317. She reported some improvement in bladder symptoms since being diagnosed with diabetes, but she indicated she lacked feeling and could not tell when she needed to use the restroom. *Id.* She indicated she was taking one to three Percocet per day, but that she had

10

taken three per day on most days over the prior month. *Id.* She assessed her pain as an eight of 10 and indicated it occurred in her back, leg, and right foot. *Id.* Ms. Tartaro observed Plaintiff to have normal gait; tenderness to palpation in her midline, facets, sacroiliac joints, paravertebrals, and gluteals; normal strength in her bilateral lower extremities; and decreased sensation to light touch in her right lower extremity. Tr. at 318.

On February 19, 2010, Plaintiff reported her blood sugar was better controlled, but complained of weight gain. Tr. at 390. Dr. Finch indicated Plaintiff's weight gain was likely the result of her medication. *Id.* Aside from trace edema in Plaintiff's extremities, Dr. Finch noted no abnormalities on examination. Tr. at 391. She ran blood work and instructed Plaintiff to follow up in four to six months. *Id.*

On March 18, 2010, Plaintiff reported to Ms. Tartaro that pain in her right lower extremity was interrupting her sleep and requiring her to increase her pain medication. Tr. at 312. She described pain, swelling, and popping in her right knee and indicated her pain was aggravated by walking and climbing stairs. *Id.* She stated she was taking three to four Percocet daily, but had previously taken one to two. *Id.* Ms. Tartaro observed Plaintiff to have an antalgic gait; tenderness to palpation in her midline, facets, sacroiliac joint, paravertebrals, and gluteals; normal strength in her bilateral lower extremities; decreased sensation to light touch in her right lower extremity; trace edema in her bilateral lower extremities; and crepitus, decreased range of motion, and mild edema in her right knee. Tr. at 313–14. She recommended Plaintiff obtain a new lumbar MRI, a creatinine panel, and a right knee x-ray. Tr. at 315.

On April 14, 2010, Plaintiff reported to Ms. Tartaro that her knee and back pain had improved over the prior week. Tr. at 308. She stated she typically took between two and four Percocet daily, but had been taking two per day over the past week. *Id.* She indicated she was walking and engaging in slightly more activity since her pain had improved. *Id.* Plaintiff assessed her pain as a seven of 10. *Id.* She endorsed incontinence, back pain, joint pain, and stiffness. Tr. at 309. Ms. Tartaro described Plaintiff's gait as antalgic and noted tenderness to palpation of her midline, sacroiliac joint, paravertebrals, and gluteals. *Id.* Plaintiff had normal strength in her bilateral lower extremities, but decreased sensation to light touch in her right lower extremity. *Id.*

Plaintiff presented to Dr. Finch on May 5, 2010, complaining of recent tightness and pressure in her chest, as well as anxiety. Tr. at 389. She stated the chest pressure did not worsen with walking or other physical activity and was not accompanied by shortness of breath. *Id.* An EKG was normal. *Id.* Dr. Finch prescribed one milligram of Ativan to be taken twice a day and instructed Plaintiff to follow up in two weeks. *Id.*

On May 19, 2010, Plaintiff reported she was tolerating her medications well. Tr. at 387. Dr. Finch noted no abnormalities on examination, aside from a few superficial blisters on Plaintiff's feet. *Id.* She increased Plaintiff's nighttime dosage of Novolog to 28 units and prescribed Avandia and Metformin. Tr. at 388.

Plaintiff reported to Ms. Tartaro that she was doing better on June 16, 2010. Tr. at 305. She stated her pain was an eight of 10 and occurred in her back, right lower extremity, and right foot. *Id.* She complained of incontinence, joint pain, and stiffness. Tr. at 306. Ms. Tartaro observed tenderness in Plaintiff's midline, facet joints, paravertebral

12

spine, and gluteals, but manual muscle testing was normal. *Id.* Plaintiff had decreased sensation to light touch in her right lower extremity. *Id.*

Plaintiff followed up with Dr. Finch for diabetes management on August 20, 2010. Tr. at 386. She reported fatigue and weight gain. *Id.* Dr. Finch observed no abnormalities on examination. *Id.* She ran complete metabolic and lipid panels, checked Plaintiff's A1C, and instructed Plaintiff to follow up in three months. *Id.*

On October 4, 2010, Plaintiff told Ms. Tartaro that she had good and bad days, but that cold weather worsened her pain. Tr. at 301. She complained of aggravated right hip pain over the prior two-month period and indicated it was waking her up at night. *Id.* Plaintiff assessed her pain as a seven of 10 and stated it occurred in her back, hip, leg, foot, and toes. *Id.* She endorsed incontinence, joint pain, and stiffness. Tr. at 302. Ms. Tartaro observed Plaintiff to have an antalgic gait, decreased rotation and extension in her thoracolumbar spine, and tenderness to palpation in the right midline, facet joints, and sacroiliac joint. *Id.* Plaintiff had normal strength, but decreased sensation to light touch in the right lower extremity. Tr. at 302–03. She reported that her dosage of Prozac was recently increased because of anxiety. Tr. at 302. Ms. Tartaro indicated Plaintiff should continue taking the 40 milligram dose of Prozac and should take Ativan only rarely, as needed. *Id.* Ms. Tartaro discussed with Plaintiff options for physical and water therapy and injections. Tr. at 301. She refilled Neurontin, Percocet, and Prozac. Tr. at 303.

Plaintiff presented to Dr. Finch for primary care follow up on November 24, 2010. Tr. at 385. She reported daily headaches upon waking, snoring, heavy periods, and significant fatigue. *Id.* She also complained of muscle pain and pain in her back and neck.

*Id.* Dr. Finch noted no abnormalities on examination. *Id.* She suspected Plaintiff had sleep apnea, but indicated she was unable to refer Plaintiff to a sleep specialist because of the expense. *Id.*

On December 8, 2010, Plaintiff informed Ms. Tartaro that she had settled her Workers' Compensation claim and inquired about disability. Tr. at 298. She stated her diabetes was under control and her incontinence had improved. *Id.* She complained of more right lower extremity pain and indicated she was taking one-and-a-half to two Percocet daily. *Id.* She rated her pain as an eight of 10. *Id.* Ms. Tartaro observed tenderness in Plaintiff's midline, facet joints, and gluteals. Tr. at 299. Plaintiff had normal strength in her bilateral lower extremities, but sensation was decreased to light touch in her bilateral extremities, with the right being worse than the left. *Id.*

Plaintiff followed up with Ms. Tartaro on February 7, 2011. Tr. at 294–97. She reported increased pain due to cold and rainy weather. Tr. at 294. She indicated she had not looked into vocational rehabilitation, and assessed her pain as a nine of 10 in her back, hip, leg, and foot. *Id.* Ms. Tartaro observed Plaintiff to walk with an antalgic gait and to have tenderness to palpation in her midline, facet joints, sacroiliac joint, paravertebral area, and gluteals on the right. Tr. at 295. Plaintiff had normal strength, but decreased sensation to light touch in her right lower extremity. *Id.* Ms. Tartaro refilled prescriptions for Percocet and Prozac and instructed Plaintiff to follow up in two to four months. Tr. at 296.

On February 22, 2011, Dr. Finch indicated Plaintiff's cholesterol and blood sugar were well controlled on medications. Tr. at 384. Plaintiff denied fatigue, but reported

occasional arthralgia and pain. *Id.* Dr. Finch discontinued Avandamet and instructed Plaintiff to take Metformin with Novolog. *Id.*

On May 25, 2011, Plaintiff indicated to Dr. Finch that she was unable to check her blood sugar because she could not afford test strips. Tr. at 425. She complained of pain in her left arm when lifting. *Id.* Dr. Finch switched Plaintiff's insulin to a less expensive medication and instructed her to follow up in two months. *Id.*

Plaintiff followed up with Dr. Finch on June 25, 2011, for muscle cramps, pain in her left arm and shoulder, wrist discomfort, and fatigue. Tr. at 424. Dr. Finch observed Plaintiff to have normal gait and no sensory deficits. *Id.* Plaintiff had slight tenderness in her wrists, but no active synovitis. *Id.* Her left shoulder ROM was restricted past 90 degrees of abduction and she had tenderness in her left trochanteric bursa. *Id.* Dr. Finch checked Plaintiff's electrolyte and magnesium levels, injected her left shoulder with a combination of Depo-Medrol and Lidocaine, and referred her to an orthopedist. *Id.*

On June 27, 2011, Plaintiff reported to Ms. Tartaro that she was taking two to three Percocet per day. Tr. at 456. She indicated her mother required hospice care and that she fed her mother, but did not bend or lift to provide assistance. *Id.* Plaintiff reported that Prozac and prayer were helping her to deal with her mother's illness and declined a referral to a psychiatrist. *Id.* Ms. Tartaro observed Plaintiff to have a mildly antalgic gait and station. Tr. at 457. Plaintiff was tender to palpation in her midline, paravertebrals, and gluteals. *Id.* She had normal manual muscle testing, except for four of five strength in her right quads. *Id.* Sensation in her right lower extremity was decreased to light touch. *Id.*

15

State agency consultant Craig Horn, Ph. D. ("Dr. Horn"), completed a psychiatric review technique form ("PRTF") on July 13, 2011. Tr. at 402–15. Dr. Horn considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders, but found that Plaintiff's impairments were not severe. Tr. at 402.

On July 27, 2011, state agency medical consultant Seham El-Ibiary, M.D., assessed Plaintiff as having the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders/ropes/scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently climb ramps/stairs; and avoid even moderate exposure to hazards. Tr. at 416–23.

On August 25, 2011, Plaintiff followed up with Dr. Finch to discuss medication changes and complained of continued left shoulder pain. Tr. at 428.

On September 21, 2011, Plaintiff complained of pain and weakness in her right leg and foot and indicated she had fallen three times since May. Tr. at 449. Ms. Tartaro observed Plaintiff to have normal gait and station; tenderness to palpation in her midline, facets, sacroiliac joint, paravertebrals, and gluteals; normal manual muscle strength; and decreased sensation to light touch in her right lower extremity. Tr. at 451. She increased Plaintiff's dosage of Neurontin to one tablet twice a day and two tablets at bedtime. *Id.*

Plaintiff presented to Stephen M. Kana, M.D. ("Dr. Kana"), for an orthopedic consultation on October 5, 2011. Tr. at 432. Plaintiff complained of pain in the anterior aspect of her neck and left shoulder. *Id.* Plaintiff had full ROM of her neck with mild

16

discomfort and no pain with extension. *Id.* Spurling's maneuver was mildly positive. *Id.* Plaintiff had full ROM of her left arm, but had pain at extreme forward flexion and abduction. *Id.* She had good grip and infraspinatus strength. *Id.* X-rays showed type II acromion with acromioclavicular ("AC") joint arthritis in Plaintiff's left shoulder and a loss of cervical lordosis. Tr. at 433. Dr. Kana diagnosed a rotator cuff tear and referred Plaintiff for an MRI. *Id.*

On October 6, 2011, Plaintiff brought in disability forms for Dr. Finch to complete. Tr. at 488. She reported back and shoulder pain. *Id.* Dr. Finch noted Plaintiff had difficulty with back pain in her lower lumbar area and neuropathy in her bilateral legs. *Id.* She indicated she would attempt to obtain records from Plaintiff's surgeon and pain management physician before completing the disability forms. *Id.*

Plaintiff followed up with Dr. Kana on October 19, 2011, after obtaining an MRI. Tr. at 440. She continued to complain of pain in her left shoulder at night and weakness with overhead activities. *Id.* Dr. Kana indicated the MRI showed evidence of impingement syndrome and AC joint arthritis. *Id.* He discussed with Plaintiff the options for treatment, and Plaintiff elected to proceed with conservative measures that included cortisone injection and therapy. *Id.*

On October 26, 2011, Plaintiff reported to Ms. Tartaro that the increased dosage of Neurontin had helped to increase the feeling in her right foot. Tr. at 445. She continued to complain of dizziness when bending. *Id.* Ms. Tartaro observed Plaintiff to be tender to palpation in her midline, sacroiliac joints, paravertebral spine, and gluteals. *Id.* Plaintiff

had normal gait and station and normal strength in her bilateral lower extremities. *Id.* She had decreased sensation to light touch. *Id.*

State agency consultant Debra C. Price, Ph. D., considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders in a PRTF on December 13, 2011. Tr. at 460. She found that Plaintiff's mental impairments were not severe. *Id.*

State agency medical consultant Dale Van Slooten, M.D., completed a physical residual functional capacity ("RFC") assessment on December 13, 2011. Tr. at 481. He found Plaintiff to have the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders/ropes/scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently climb ramps/stairs; occasionally reach overhead with the left upper extremity; and avoid concentrated exposure to hazards. Tr. at 474–81.

On January 13, 2012, Plaintiff reported to Dr. Finch that her fasting blood sugar ranged from 98 to 160. Tr. at 487. Dr. Finch noted no abnormalities on examination. *Id.* She discontinued Plaintiff's medication for Lipofen because of muscle pain and refilled her other medications. *Id.* Dr. Finch proffered a medical opinion regarding Plaintiff's ability to perform work-related activities, which is detailed further below. Tr. at 482–83.

On February 29, 2012, Plaintiff reported "all over pain" and achiness in her arms and bilateral shoulders and weakness in her right upper extremity. Tr. at 497. She stated she took two Percocet on a good day and four on a bad day. *Id.* Ms. Tartaro noted tenderness to palpation in Plaintiff's trapezius and midline. Tr. at 498. Plaintiff had

18

normal strength in her bilateral upper and lower extremities and decreased sensation to light touch and pin prick in her bilateral lower extremities. Tr. at 498–99. Ms. Tartaro recommended a cervical MRI, and Plaintiff indicated she would contact the hospital regarding financial sponsorship for the MRI. *Id.*

On May 16, 2012, Plaintiff indicated to Dr. Finch that her blood sugar was running around 130. Tr. at 486. She complained of lower extremity neuropathy and preulcerative calluses. *Id.* She indicated she stopped Lovastatin because of muscle pain, but the pain persisted. *Id.* Dr. Finch observed no abnormalities on examination. *Id.* She refilled Plaintiff's medications and encouraged her to restart Lovastatin and to work on diet and exercise. *Id.*

Plaintiff followed up with Ms. Tartaro on June 27, 2012. Tr. at 489. She recounted right lower extremity pain the prior week that subsequently resolved. *Id.* She stated she was taking two Percocet and three Neurontin on most days. *Id.* Ms. Tartaro observed tenderness to palpation in Plaintiff's midline, facets, sacroiliac joints, paravertebrals, and gluteals. Tr. at 490. Plaintiff had normal lower extremity strength, but decreased sensation to light touch in her bilateral lower extremities. *Id.*

On October 25, 2012, Plaintiff informed Ms. Tartaro she was taking two to four Percocet per day because the cold weather exacerbated her pain. Tr. at 581. She indicated she stayed active at home and was walking for exercise. *Id.* Plaintiff endorsed more significant depression due to the one-year anniversary of her mother's death. *Id.* Ms. Tartaro discussed psychiatric treatment and changes in medication, but Plaintiff was reluctant to pursue either. *Id.* Ms. Tartaro noted tenderness in Plaintiff's midline,

encouraged her to get out of her house more, and gave her samples of Celebrex to take as needed. Tr. at 582–83.

b.    Evidence Submitted to Appeals Council

On April 9, 2013, a lower extremity nerve conduction study ("NCS") and electromyography ("EMG") indicated active denervation in the left L5-S1 root and the right L3-4 and L5 root. Tr. at 586.

On May 8, 2013, Carol Kooistra, M.D. ("Dr. Kooistra"),[1] completed a questionnaire in which she indicated Plaintiff could not engage in anything more than sedentary work and could not perform work that involved more than basic one and two step processes. Tr. at 595. Dr. Kooistra based her opinion on Plaintiff's diagnoses of chronic pain, lumbar radiculopathy, diabetic polyneuropathy, and lumbar stenosis. *Id.* She indicated her opinion was supported by MRI, NCS, Plaintiff's history, and examinations. *Id.* She further indicated Plaintiff's condition had most probably persisted at the same level for more than four months and cited the 2007 MRI and Plaintiff's history of treatment at the pain clinic beginning in 2002. *Id.*

In a letter dated June 28, 2013, Dr. LaTourette noted that Plaintiff's diagnoses included post-laminectomy syndrome, following a fusion at L5-S1, and lumbar canal stenosis, resulting from congenital and degenerative changes. Tr. at 593. He explained Plaintiff's complaints of low back and right lower extremity pain were consistent with her clinical history and MRI results. *Id.* He indicated Plaintiff had decreased sensation to light touch in her right lower extremity and decreased strength in her extensor hallucis

_____

[1] Dr. Kooistra was the neurologist who performed the EMG/NCS. Tr. at 586–87.

longus muscle, which most probably limited her to no more than sedentary work. *Id.* He further explained that Plaintiff would require frequent position changes at will because of low back pain and her concentration would likely be interrupted by her right leg and low back pain to the extent that she would be unable to maintain a production pace. *Id.* Dr. LaTourette indicated Plaintiff's presentation was credible and consistent over time and that the specified limitations had been in place since at least 2007. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on January 2, 2013, Plaintiff testified her most severe problem was her back and stated she had nerve damage in her foot and leg. Tr. at 78. Plaintiff indicated she injured her back while working in 2001 and had surgery in May 2002. Tr. at 79. She testified her physicians had discussed implanting a nerve stimulator, but she did not have insurance to cover such a procedure. *Id.* Plaintiff stated her back pain radiated from her back to her hip, sciatic nerve, leg, foot, and toes. Tr. at 80. Plaintiff indicated her pain was typically a seven or eight on a 10-point scale and reached a 10 before she took her medication. *Id.* She stated she could hardly move because of the achiness and pain and that her pain often awakened her during the night. *Id.* Plaintiff testified she was released from her job in 2007 and was having difficulty lifting and walking at that time. Tr. at 89.

Plaintiff indicated she was 5'9" and weighed 276 pounds. Tr. at 81. She stated her insulin and other medications caused her to be drowsy and confused, to gain weight, and to experienced forgetfulness and dizziness. Tr. at 81, 85. She indicated that her doctors

had not recommended she undergo gastric bypass surgery. *Id.* She stated she had been diagnosed with diabetes three years earlier and took insulin before every meal. Tr. at 82. Plaintiff testified she had symptoms of depression and anxiety, but she denied being under the treatment of a psychiatrist or psychologist or having been hospitalized for psychiatric reasons. Tr. at 82–83. She indicated she had arthritis in her neck, shoulders, hands, knees, and feet. Tr. at 83. She stated she sometimes had difficulty raising her hand and moving her arms. *Id.*

Plaintiff was unable to estimate how far she could walk. Tr. at 80. She testified she was told to not lift over 15 pounds, but felt pain when lifting a gallon of milk. Tr. at 81. Plaintiff stated she experienced pain in her tailbone, stiffness, and leg spasms when she sat for lengthy periods. *Id.* She indicated she could sit for 15 minutes at a time. *Id.* Plaintiff indicated she would sometimes lie down three or four times a day to reduce her pain. Tr. at 86. She stated she was unable to climb more than a few steps at a time. Tr. at 87. She indicated she could not kneel or twist without back pain. Tr. at 87–88. She stated she had recently started dropping items on a frequent basis. Tr. at 88–89. Plaintiff indicated her knee sometimes gave way and caused her to fall. Tr. at 89.

Plaintiff testified she prepared light meals, but used a stool when cooking. Tr. at 85, 86. She indicated she had a driver's license and was able to drive. *Id.* She stated she shopped for groceries. *Id.* She indicated she experienced throbbing back pain when she cleaned her toilet bowl and performed other housework. Tr. at 86. She stated she could do part of a household job, but had to sit down before completing it. *Id.* Plaintiff testified she walked for exercise for approximately 20 minutes on an average of two days per week.

Tr. at 89–90. She indicated she had some problems with her memory and that her husband handled the household bills. Tr. at 90. She stated she attended church, but had difficulty sitting through the service. Tr. at 91.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Kathleen H. Robbins, Ph. D., reviewed the record and testified at the hearing. Tr. at 94–103. The VE categorized Plaintiff's PRW as a child daycare worker, as light in the *Dictionary of Occupational Titles* ("*DOT*"), but medium as performed, with a specific vocational preparation ("SVP") of four, and a preschool director, as sedentary in exertional level with an SVP of seven in the *DOT*, but an SVP of five as performed. Tr. at 95–96. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, but could never use a ladder, rope, or scaffold; could occasionally balance, stoop, kneel, crouch, or crawl; must avoid even moderate exposure to hazards; and was limited to occasional overhead reaching with the left upper extremity. Tr. at 97. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 98. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two as a marker in retail trade, with 3,500 positions in South Carolina and 267,000 positions nationally; a cashier, II, with 14,000 positions in South Carolina and 824,000 positions nationally; and a fitting room attendant, with 3,000 positions in South Carolina and 194,000 positions nationally. Tr. at 98–99.

Plaintiff's representative asked if a need to take pain medication or to lie down up to three times per day would affect an individual's ability to perform the jobs identified in response to the first hypothetical. Tr. at 99. The VE indicated an individual would be vocationally disabled if she had to lie down during an eight-hour workday. *Id.* Plaintiff's representative then asked if difficulty remembering tasks would affect the individual's ability to perform the jobs identified in response to the first hypothetical question. Tr. at 99–100. The VE testified that the individual would be unable to perform the identified jobs. Tr. at 100. Plaintiff's representative asked if an inability to stand and walk for 20 minutes or more at a time would affect the individual's ability to perform the identified jobs. *Id.* The VE testified that the individual would be unable to perform work as a marker in retail, but indicated jobs as a fitting room attendant and cashier sometimes allowed for use of a stool. *Id.* Plaintiff's representative asked if a need for more than the typical breaks would affect the individual's ability to sustain the identified jobs. Tr. at 102–03. The VE testified that an individual would be unable to maintain employment if she were taking usual and extended breaks. Tr. at 103. She also testified being absent on three or more days per month would be considered excessive. Tr. at 104.

2.    The ALJ's Findings

In his decision dated February 1, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.
2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 22, 2007 through her date last insured of December 31, 2012 (20 CFR 404.1571 *et seq.*).

24

3.      Through the date last insured, the claimant had the following severe impairments: degenerative disc disease, obesity, neuropathy, and degenerative joint disease of the neck and shoulder (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). The claimant retains the ability to lift and/or carry up to 20 pounds on an occasional basis, lift and/or carry up to 10 pounds on a frequent basis, stand/walk a total of 6 hours out of an 8-hour workday, and sit for about 6 hours out of an 8-hour workday. She can occasionally balance, stoop, kneel, crouch, or crawl and never climb ladders, ropes or scaffolds. She must avoid moderate exposure to hazards. Overhead reaching with the left upper extremity is limited to occasional.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on March 24, 1960 and was 52 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.      The claimant was not under a disability, as defined in the Social Security Act, at any time from March 22, 2007, the alleged onset date, through December 31, 2012, the date last insured (20 CFR 404.1520(g)).

Tr. at 27–39.

D.    Appeals Council Review

In its decision dated July 22, 2014, the Appeals Council made the following findings of fact and conclusions of law:

1.    The claimant met the special earnings requirement of the Act on March 22, 2007, the date the claimant stated she became unable to work and continues to meet them through December 31, 2013.

2.    The claimant has the following severe impairments: degenerative disc disease, obesity, neuropathy, and degenerative joint disease of the neck and shoulder, but does not have an impairment or combination of impairments which is listed in, or which is medically equal to an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

3.    The claimant's combination of impairments results in the following limitations on her ability to perform work-related activities: The claimant retains the ability to lift and/or carry up to 20 pounds on an occasional basis, lift and/or carry up to 10 pounds on a frequent basis, stand/walk a total of 6 hours out of an 8-hour workday, and sit for about 6 hours out of an 8-hour workday. She can occasionally balance, stoop, kneel, crouch, or crawl and never climb ladders, ropes or scaffolds. She must avoid moderate exposure to hazards. Overhead reaching with the left upper extremity is limited to occasional. In view of the above limitations, the claimant has the residual functional capacity to perform a reduced range of the light exertional level.

4.    The claimant's subjective complaints are not fully credible for the reasons identified in the body of the Administrative Law Judge decision.

5.    The claimant is unable to perform past relevant work as a childcare worker (light, semi-skilled); a preschool director (sedentary, skilled); and a resource teacher (light, skilled) for the reasons identified in the Administrative Law Judge decision.

6.    At the alleged onset date, the claimant was classified as a younger individual. However, the claimant changed age categories, and, at the time of the decision, is defined as an individual closely approaching advanced age. The claimant has a high school education. The claimant's past relevant work is semiskilled or skilled. The issue of transferability of work skills is not material in view of the claimant's age and residual functional capacity.

7.    If the claimant had the capacity to perform the full range of the light exertional level, 20 CFR 404.1569 and Rules 202.21 and 202.14, Table No. 2 of 20 CFR Part 404, Subpart P, Appendix 2, would direct a conclusion of not disabled. Although the claimant's exertional and nonexertional impairments do not allow her to perform the full range of the light exertional level, using the above-cited Rule as a framework for

decisionmaking, there are a significant number of jobs in the national economy which she could perform as set forth in Finding 10 of the decision by the Administrative Law Judge.

8.    The claimant is not disabled as defined in the Social Security Act at any time through the date of the Administrative Law Judge's decision (February 1, 2013).

Tr. at 5–6.

## II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to properly evaluate the opinion of Plaintiff's treating physician; and

2)    the Appeals Council should have remanded the claim based on the new evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.    Legal Framework

#### 1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See*

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Medical Opinions

Plaintiff argues the ALJ did not properly consider Dr. Finch's opinion. [ECF No. 7 at 26]. She argues Dr. Finch's opinion was not inconsistent with her treatment records. *Id.* at 28. She maintains the ALJ did not take into account that Dr. Finch indicated it was the combination of Plaintiff's impairments that resulted in the specified restrictions. *Id.* She contends the ALJ ignored the fact that Dr. Finch based her opinion on treatment notes

from Plaintiff's other providers, as well as her own observations. *Id.* at 28–29. Plaintiff argues the ALJ ignored evidence that refuted his conclusion and neglected his duty to resolve conflicting evidence. *Id.* at 29. She maintains the ALJ improperly relied upon indications in the record that her condition was stable and she was "doing well" to dispute Dr. Finch's opinion. *Id.* at 30–31. Plaintiff argues the ALJ erred in assigning great weight to the non-examining medical opinions. *Id.* at 32.

The Commissioner argues Dr. Finch's opinion was inconsistent with the evidence of record, including her own treatment notes, and the ALJ did not err in discounting her opinion. [ECF No. 8 at 19]. She maintains the ALJ considered Plaintiff's indications that she was doing well in the proper context. *Id.* at 21. She contends the ALJ properly considered the fact that Dr. Finch did not treat Plaintiff for back, neck, and shoulder pain. *Id.* at 22. She also argues Dr. Finch's statement that Plaintiff was unable to perform full-time gainful employment required no particular deference because it was an opinion on an issue reserved to the Commissioner. *Id.* Plaintiff maintains the ALJ properly weighed and relied upon the opinions of the state agency consultants. *Id.*

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record).

Pursuant to SSR 96-2p:

> Adjudicators must remember that a finding that a treating source medical
> opinion is not well-supported by medically acceptable clinical and
> laboratory diagnostic techniques or is inconsistent with the other substantial
> evidence in the case record means only that the opinion is not entitled to
> "controlling weight," not that the opinion should be rejected. Treating
> source medical opinions are still entitled to deference and must be weighed
> using all of the factors provided in 20 C.F.R. 404.1527.

SSA rules require that the ALJ carefully consider medical opinions on all issues.

SSR 96-5p. Pursuant to 20 C.F.R. § 404.1527(c), if a treating source's opinion is not

accorded controlling weight, the ALJ should consider "all of the following factors" to

determine the weight to be accorded to every medical opinion in the record: examining

relationship; treatment relationship, including length of treatment relationship and

frequency of examination and nature and extent of treatment relationship; supportability

of the opinion based upon the provider's record; consistency with the record as a whole;

specialization of the medical source; and other factors. *See also Johnson*, 434 F.3d at 654.

The ALJ's decision must explain the weight accorded to all opinion evidence. 20 C.F.R.

§ 404.1527(e)(2)(ii). In all unfavorable and partially-favorable decisions and in fully-

favorable decisions based in part on treating sources' opinions, the ALJ must include the

following:

> [T]he notice of the determination or decision must contain specific reasons
> for the weight given to the treating source's medical opinion, supported by
> the evidence in the case record, and must be sufficiently specific to make
> clear to any subsequent reviewers the weight the adjudicator gave to the
> treating source's medical opinion and the reason for that weight.

SSR 96-2p.

On May 13, 2012, Dr. Finch proffered an opinion regarding Plaintiff's ability to do work-related activities. Tr. at 482–83. She indicated Plaintiff could frequently reach, handle, finger, feel, and push/pull. Tr. at 482. She wrote that Plaintiff's physical functions were affected by fatigue with activity, risk of hypoglycemia secondary to diabetes, and lower extremity neuropathy that reduced her balance. *Id.* She indicated Plaintiff's pain was present to such an extent as to be distracting to adequate performance of daily activities or work. *Id.* She noted that physical activity, such as walking, standing, bending, stooping, and moving extremities was likely to greatly increase Plaintiff's pain to such a degree as to cause distraction from or total abandonment of tasks. Tr. at 483. Dr. Finch checked a space on a form to indicate "[i]t is my opinion that she is <u>unable to perform</u> any full-time gainful employment job because of her current medical conditions." Tr. at 484. She indicated Plaintiff was treated for diabetes, back pain, neuropathy, hypertension, and hypercholesterolemia. *Id.*

The ALJ accorded "limited weight" to Dr. Finch's opinion. Tr. at 36. He wrote "[w]hile I agree with some of her limitations, her findings as a whole are excessive and inconsistent with her treatment record." Tr. at 36–37. He noted that Dr. Finch's records showed that Plaintiff was tolerating her blood pressure medications well; had minimal pain from lumbar disc disease; had good control of diabetes and hypertension; and was doing well overall. Tr. at 37.

The undersigned recommends the court find the ALJ did not adequately consider Dr. Finch's opinion. The ALJ essentially disregarded the opinion of Plaintiff's treating physician because he determined her opinion was not supported by her treatment records.

33

*See* Tr. at 36–37. While an ALJ must consider the supportability of a medical opinion, supportability is only one factor to be weighed. *See* 20 C.F.R. § 404.1527(c). A finding that a treating physician's opinion is not supported by her treatment record may be sufficient to defeat the presumption that it is entitled to controlling weight, but it is an insufficient reason for declining to provide deference to the opinion and for failing to consider the opinion based on the factors set forth in 20 C.F.R. § 404.1527(c). *See* SSR 96-2p.

The ALJ neglected to consider Dr. Finch's opinion in light of its consistency with the record as a whole. Although Dr. Finch was Plaintiff's primary care physician and primarily treated Plaintiff for diabetes and hypertension, she did not render her opinion based solely on her own treatment notes. Dr. Finch specifically declined to provide an opinion without reviewing Plaintiff's surgical and pain management records. Tr. at 488. The record reflects that Plaintiff was injured in 2001, underwent surgery in 2002 that was only partially successful, and obtained regular pain management for lumbar radiculopathy, post-laminectomy syndrome, and degenerative disc disease between 2002 and the date of the hearing. *See* Tr. at 231, 238–39, 293–371, 442–59, 489–579, 581–85. An MRI of Plaintiff's lumbar spine in November 2007 revealed moderate disc bulges at L4-5 and L5-S1 and central canal stenosis at L3-4 and L4-5. Tr. at 370–71. Plaintiff was diagnosed with diabetes and has been insulin-dependent since at least September 2009. Tr. at 398. She was diagnosed with left shoulder impingement syndrome and AC joint arthritis in October 2011. Tr. at 440. Although Plaintiff reported lower pain levels during some visits, she often complained of pain at or above a seven of 10. *See* Tr. at 294, 298,

301, 305, 308, 317, 321, 324, 339, 363, 520. On October 25, 2012, the date of Plaintiff's last visit with Ms. Tartaro prior to the hearing, Plaintiff indicated she was taking two to four Percocet per day for pain. Tr. at 581. She was also prescribed four 300-milligram tablets of Neurontin daily. Tr. at 583. Despite this significant amount of pain medication, Plaintiff was unable to achieve adequate pain control on some days, and Ms. Tartaro gave her samples of Celebrex to be taken "for bad days only." *Id.*

The ALJ also neglected evidence in Dr. Finch's records that supported her opinion. On August 20, 2010, Plaintiff complained to Dr. Finch of fatigue. Tr. at 386. She continued to endorse fatigue and also reported pain in her muscles, back, and neck during a visit on November 24, 2010. Tr. at 385. Plaintiff reported occasional arthralgia and pain on February 22, 2011. Tr. at 384. On May 25, 2011, Plaintiff complained to Dr. Finch of pain in her left arm. Tr. at 425. The next month, she continued to report pain in her left arm and shoulder, but also endorsed muscle cramps and fatigue. Tr. at 424. Dr. Finch observed Plaintiff to have restricted ROM in her left shoulder. *Id.* Plaintiff again complained of left shoulder pain on August 25, 2011, and Dr. Finch referred Plaintiff to Dr. Kana. Tr. at 428. On October 6, 2011, Plaintiff complained of back and shoulder pain and Dr. Finch noted her to have back pain her left lumbar area and neuropathy in her bilateral legs. Tr. at 488. Dr. Finch discontinued Lipofen in January 2012, after Plaintiff complained of muscle pain. Tr. at 487. However, Plaintiff continued to endorse muscle pain on May 16, 2012, and also complained of lower extremity neuropathy. Tr. at 486.

The ALJ was not required to provide greater weight to the evidence that supported Dr. Finch's opinion to the exclusion of the evidence he cited as contradicting it, but he

was required to consider and explain the weight he accorded to the entirety of the evidence. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) ("We cannot in the present case determine in which category the report falls because the ALJ failed to indicate the weight given to the medical evidence, some of which supported Dr. Bruce's testimony and some of which did not."). Dr. Finch's treatment notes, the treatment records, of Plaintiff's other providers, and the objective evidence arguably support her opinion that Plaintiff's ability to work was limited by fatigue, impaired balance, and distractibility due to pain. *See* Tr. at 482–83. Because the ALJ neglected to weigh all of the relevant evidence in assessing the supportability and consistency factors under 20 C.F.R. § 404.1527(c), the undersigned recommends the court find substantial evidence did not support the ALJ's conclusion that Dr. Finch's opinion was inconsistent with her treatment records.

The undersigned further recommends a finding that the ALJ erroneously credited "significant weight" to the opinions of the non-treating, non-examining state agency medical consultants Dr. El-Ibiary and Dr. Van Slooten. *See* Tr. at 37. In *Gordon*, the Fourth Circuit explained that it is improper for an ALJ to rely on an opinion from a non-treating, non-examining physician that is completely contradicted by other evidence in the record. *Gordon*, 725 F.2d at 235, citing *Martin v. Secretary*, 492 F.2d 905 (4th Cir. 1974). However, the court further explained that an ALJ may rely on a non-treating, non-examining physician's opinion that is consistent with the record. *Id.*, citing *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971). To support his opinion, Dr. El-Ibiary cited only records from Carolinas Center for Advanced Management of Pain from November

2007 through February 7, 2011, and records from Dr. Finch from September 10, 2009 through February 22, 2011. Tr. at 414. Dr. Van Slooten cited no specific records in support of his opinion. Tr. at 474–81. Dr. El-Ibiary and Dr. Van Slooten both rendered opinions before much of the evidence was made part of the record, including Dr. Finch's opinion and pain management records from 2002 to June 2007. *Compare* Tr. at 416–23 and 474–81, *with* Tr. at 482–83, 489–579. They also lacked access to Plaintiff's treatment records after October 2011. *See* Tr. at 486–88, 580–85. The medical consultants' lack of access to subsequent evidence does not prevent the ALJ from giving significant weight to the consultants' opinions in and of itself, but, here, the ALJ failed to bridge the gap between the opinions and the subsequent evidence. *See Putman v. Colvin*, C/A No. 6:13-925-MGL-KFM, 2012 WL 3808492, *15 (D.S.C. July 30, 2014) ("[A]n ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ accounts for any subsequent evidence, and substantial evidence supports the ALJ's decision."). In light of evidence in the record that was inconsistent with Dr. El-Ibiary's and Dr. Van Slooten's opinions and because of the ALJ's failure to adequately weigh Dr. Finch's opinion, the ALJ's reliance on the state agency consultants' opinions was not supported by substantial evidence.

2.    New Evidence

Plaintiff argues the Appeals Council erred in declining to remand the claim based upon the opinions from Dr. Kooistra and Dr. LaTourette and the EMG/NCS results. [ECF No. 7 at 33]. She maintains the new evidence directly conflicts with the ALJ's findings

and that the ALJ might have reached a different conclusion if he had reviewed the new evidence. *Id.* at 34–35.

The Commissioner argues the April 9, 2013, NCS/EMG and Dr. Kooistra's May 8, 2013, opinion did not relate to the period on or before the ALJ's decision and were not material. [ECF No. 8 at 24]. She maintains Dr. LaTourette's June 28, 2013, opinion was not new because Plaintiff could have obtained the opinion prior to the ALJ's decision. *Id.* She distinguishes this case from *Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011) in that, unlike in *Meyer*, the ALJ did not base his decision on the lack of a treating physician's opinion. *Id.* at 25. She further contends Dr. LaTourette's opinion was not material because he generally did not treat Plaintiff during the relevant period. *Id.*

"If 'dissatisfied' with an ALJ decision as to entitlement to disability benefits, a claimant 'may request' that the Appeals Council review 'that action.'" *Meyer*, 662 F.3d at 704, citing 20 C.F.R. § 404.967. The Appeals Council will grant the request for review if there is an apparent abuse of discretion by the ALJ; if there is an error of law; if the ALJ's action, findings, or conclusions were not supported by substantial evidence; or if the case concerns a broad policy or procedural issue that may affect the general public interest. 20 C.F.R. § 404.970.

"The regulations also specifically permit claimants to submit additional evidence, not before the ALJ, when requesting review by the Appeals Council." *Meyer*, 662 F.3d at 705. "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). "Evidence is new 'if

it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer*, 662 F.3d at 705, citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). If the new and material evidence relates to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. 20 C.F.R. § 970(b).

If the Appeals Council finds that the ALJ's "action, findings, or conclusion is contrary to the weight" of all evidence, including the new and material evidence, the Appeals Council will grant the request for review and either issue its own decision on the merits or remand the case to the ALJ. *Meyer*, 662 F.3d at 705, citing 20 C.F.R. § 404.970(b). However, if after considering all evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were not contrary to the weight of the evidence, the Appeals Council can deny review with or without explaining its rationale. *Id.* at 705–06.

In a notice dated May 20, 2014, the Appeals Council indicated it considered the record from Dr. LaTourette dated June 28, 2013, the record from Carolina Neurology dated April 9, 2013, and the medical source statement from Dr. Kooistra dated May 8, 2013, but found this information did not provide a basis for changing the ALJ's decision. Tr. at 125. The Appeals Council did not discuss this evidence with specificity in its decision. *See* Tr. at 5–6.

The Commissioner's argument that the records submitted to the Appeals Council were not new and material and did not pertain to the period prior to the ALJ's decision

conflicts with the Appeals Council's acceptance and consideration of the evidence. *See* Tr. at 125. The Appeals Council did not reject the evidence as not new, immaterial, or irrelevant to the period at issue, but instead found that the information did not provide a basis for changing the ALJ's decision. *See id.*

Here, unlike in *Meyer*, the Appeals Council granted review and issued a new decision in the case. *See* Tr. at 1–7. However, because the Appeals Council did not grant review based on the new evidence[4] and did not address that new evidence with specificity, the Appeals Council's treatment of the evidence was the same as if they had denied review. This is contrary to 20 C.F.R. § 404.1527(e)(3), which provides "[w]hen the Appeals Council makes a decision, it will follow the same rules for considering opinion evidence as administrative law judges follow." *See Meyer*, 662 F.3d at 705 ("[T]he regulation only applies when the Appeals Council actually 'makes a decision,' and the Appeals Council may 'issue a decision' only after it 'grant[s] the request' for review.'")[5]; *see also id.* at 706 n.2, citing *Jordan v. Califano*, 582 F.2d 1333, 1335 (4th Cir. 1978) (remanding when the Appeals Council "summarily affirmed the denial of benefits" without making any findings regarding "new items of medical evidence" and

---

[4] The Appeals Council granted review and issued a new decision because the ALJ's decision inaccurately stated that Plaintiff's date last insured for DIB was December 31, 2012. Tr. at 125. The Appeals Council instead found that Plaintiff was insured for DIB thorough December 31, 2013. Tr. at 5. However, it addressed no further issues with specificity and adopted the ALJ's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, the applicable facts, and whether the claimant was disabled. Tr. at 4.

[5] *Meyer* cites 20 C.F.R. § 404.1527(f), but subsection (f) was redesignated as subsection (e) by 77 FR 10656.

stating that the Appeals Council must "articulate . . . conclusions with respect thereto" when it grants a request for review and issues a decision); *Myers v. Califano* (611 F.2d 980, 983 (4th Cir. 1980) (remanding when Appeals Council "adopted" the ALJ's decision without making "specific findings" about new medical evidence). Because the Appeals Council granted review, but declined to address the opinion evidence, the undersigned recommends the court find it did not properly consider the opinion evidence in light of the Fourth Circuit's interpretation of the requirements of 20 C.F.R. § 404.1527(e)(3).

Furthermore, the particular evidence at issue presented opinions and medical evidence that were in conflict with the ALJ's findings and conclusions, and the Fourth Circuit has directed that remand is appropriate under such circumstances. In *Meyer*, the court remanded the case where the Appeals Council denied review after including in the record an opinion from the plaintiff's treating physician. 662 F.3d at 707. The court found that remand was appropriate because no fact finder had made "any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." *Id.* As in *Meyer*, the new evidence in this case included the opinions of treating physicians[6] and a significant objective test report. *See* Tr. at 586, 593, 595. This evidence was consistent with Dr. Finch's opinion and with other evidence in the record that conflicts with the ALJ's findings. Because

---

[6] The Commissioner argues that this case differs from *Meyer* in that the ALJ in *Meyer* supported his decision by indicating that the record lacked "restrictions placed on the claimant by a treating physician," but the ALJ in this case made no mention of a lack of restrictions from Plaintiff's treating physician. [ECF No. 8 at 25]. Although the court cited this factor in *Meyer*, it was but one of several factors that indicated remand was appropriate where there was no evidence to suggest the supporting and conflicting evidence was weighed by the fact finder.

neither the ALJ nor the Appeals Council attempted to reconcile this evidence with the other evidence in the record, the undersigned recommends the case be remanded.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

Shiva V. Hodges

June 29, 2015                                    Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).